**FILED**

JUL 0 1 2016

CLERK

## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH DAKOTA
## SOUTHERN DIVISION

TRAVIS HOSTLER,

CIV. NO. 16- 4097

Plaintiff,

vs.

RAIN AND HAIL, LLC, and RAIN AND
HAIL INSURANCE SERVICE, INC.,

Defendants.

## COMPLAINT
## AND
## DEMAND FOR JURY TRIAL

COMES NOW Plaintiff Travis Hostler ("Plaintiff" or "Plaintiff

Hostler") and for his Complaint, states and alleges as follows:

### PARTIES AND VENUE

1.   Plaintiff Hostler is a resident of Davison County, South

Dakota.

2.   Defendant Rain and Hail, LLC, is a foreign limited liability

company with its principal place of business located at 9200 Northpark

Drive, Suite 300, Johnston, Iowa 50131. It is not a citizen of South

Dakota.

1

3. Defendant Rain and Hail, LLC's registered agent in South Dakota is CT Corporation System, 319 S. Coteau Street, Pierre, South Dakota 57501.

4. Defendant Rain and Hail Insurance Service, Inc. is a foreign corporation with its principal place of business located at 9200 Northpark Drive, Suite 300, Johnston, Iowa 50131. It is not a citizen of South Dakota.

5. Defendant Rain and Hail Insurance Service, Inc.'s registered agent in South Dakota is CT Corporation System, 319 S. Coteau Street, Pierre, South Dakota 57501.

## JURISDICTION AND VENUE

6. Plaintiff Hostler invokes the jurisdiction of this Court pursuant to 28 U.S.C. § 1332 based upon diversity of the parties. The damages at issue in this matter exceed $75,000.00.

7. A substantial part of the events giving rise to this action occurred in Davison County, South Dakota. Therefore, venue is proper in this Court under 28 U.S.C. § 1391(a)(2).

## FACTS

8. Plaintiff Hostler is a farmer/rancher who farms land in the State of South Dakota.

2

9.     In 2013, Plaintiff Hostler contracted with Defendants for the provision of multi-peril crop insurance.  This contract included properties in Butte County, South Dakota.

10.     In 2013, Plaintiff Hostler insured 361 acres of farm ground in Butte County.  These 361 acres in Butte County were split into four "Optional Units" ("OUs"): OU 3.01, OU 3.02, OU 3.03, and OU 3.04.

11.     OU 3.01 consisted of 11.5 acres.

12.     OU 3.02 consisted of 32 acres.

13.     OU 3.03 consisted of 238 acres.

14.     OU 3.04 consisted of 80 acres.

15.     To be insured as grain corn in Butte County, South Dakota, a corn field needed to be irrigated.

16.     In early September 2013, Plaintiff Hostler reported a claim loss on his Butte County corn crop and requested authority to cut the corn for silage.  Defendants granted this request.

17.     Plaintiff Hostler's claim loss report ("Claim Notice") included an authorization from Defendants which stated, "Travis [Hostler] may chop his Butte County corn for silage."

18.     Between September 15, 2013 and September 20, 2013, Plaintiff Hostler's Butte County OUs (fields) were cut for silage.

3

19.    Plaintiff Hostler requested that Defendants' adjusters be present on those dates so they could appraise the RSAs as the fields were "opened up," and – after their adjustment – he could harvest his RSAs.

20.    Defendants' insurance adjusters did not visit Plaintiff Hostler's fields at the time they were being "opened up" and cut for silage, on or about September 15 – 20, 2013.

21.    At the previous arbitration hearing regarding this matter, crop insurance expert Josh Bialas ("Bialas") testified that typically an insurance adjuster would attempt to appraise an insured's RSAs at the time the insured is cutting silage so that the field could be appraised and the insured could go ahead and harvest the RSAs that same day.

22.    While cutting his silage, Plaintiff Hostler left the requisite number of "Representative Sample Areas" ("RSAs") required by the insurance policy provisions.

23.    At arbitration, no evidence was presented that Plaintiff Hostler did not leave the proper size or number of RSAs in each of his OUs (fields).

24.    However, due to a mistake by his hired silage harvester, the entirety of OU 3.01 was cut for silage, and no RSAs were left in that unit.

25.    James Thybo ("Thybo") was the primary insurance adjuster assigned to this claim.

4

26. Thybo testified at an arbitration proceeding that he did not receive notice of Plaintiff Hostler's claim until September 19, 2013.

27. Despite filing his Claim Notice in early September, Plaintiff Hostler did not hear anything from his insurance adjusters regarding an appraisal through all of September or October.

28. Thybo did not contact, or attempt to contact, Plaintiff Hostler through September and October until he met Plaintiff Hostler at his Butte County fields in late November.

29. Thybo made his appraisal of Plaintiff Hostler's fields on November 2, 2013.

30. Thybo did not attempt to contact Plaintiff Hostler when preparing to appraise his fields on or about November 2, 2013.

31. Thybo has never reviewed, or attempted to review, the results of his appraisal of Plaintiff Hostler's Butte County OUs with Plaintiff Hostler.

32. Lawrence Kymala ("Kymala"), another of Defendants' adjusters, accompanied Thybo during his appraisal on November 2, 2013.

33. At arbitration, Kymala testified that in his experience, the insured would accompany him on his appraisals 9 times out of 10.

34.     At arbitration, Kymala testified that if the insured did not
accompany him on his appraisals, he would review the results of his
appraisal with the insured as soon as possible.

35.     At arbitration, Bialas testified that the insurance company
always reviews their appraisal with the insured, usually as soon as
possible, so claims could get settled.

36.     At arbitration, Bialas testified it was industry standard for an
insurance adjuster to invite the insured to be present at the time of
appraisal and in the insured's field.

37.     At arbitration, Chris Kluge ("Kluge"), Defendants' regional
manager, testified that an adjuster is supposed to invite the insured to
accompany him on his appraisal and at least review the appraisal with
the insured.

38.     The Federal Crop Insurance Loss Adjustment Manual states:

> "When appraisals are made, inform the insured of the
> following: The method used to determine potential
> production and how the appraisal will be used...If at all
> possible, the insured...should accompany [the adjuster]
> on the entire appraisal. Encourage the insured...to
> participate in determining the appraisal...inform the
> insured of the appraisal determination."

Federal Crop Insurance Loss Adjustment Manual, pg. 234,

para. 85(D)(1),(3).

6

39.     At arbitration, Thybo and Kymala testified they used the "Maturity Line Weight Method" in performing their appraisal of Plaintiff Hostler's fields.

40.     At arbitration, Kymala testified this is primarily the only method he uses in his crop appraisals.

41.     The Corn Loss Adjustment Manual states that when moisture in corn drops below forty percent, the Mature Corn Weight Method of appraisal should be used.  The Corn Loss Adjustment Manual further states that, "If possible, [adjusters should] defer to the [mature corn] weight method."  Corn Loss Adjustment Manual pg. 15, para. D(1)).

42.     Thybo did not own a moisture tester for determining whether grain was below 40 percent moisture.

43.     Neither adjuster believed they should have used the Mature Corn Weight Method.

44.     At arbitration, Bialas testified that the adjusters should have used the Mature Corn Weight Method of appraisal.  Bialas further testified that the Maturity Line Weight Method is "easier," though not as accurate, so adjusters will often use said method.

45.     In completing the Claim Summary of his appraisal of OU 3.01, Thybo reported taking four samples from "Plot 1," "Plot 2," "Plot 3," and "Plot 4."

7

46.    However, Thybo testified that there were no RSAs or "Plots"
left in OU 3.01, due to a mistake of Plaintiff Hostler's silage harvester.

47.    Thybo took corn for their samples for OU 3.01 from a few
rows of corn standing in a low area.  Thybo did not believe this was likely
representative of the entirety of acres in OU 3.01.

48.    The completed Appraisal Worksheets, issued by Defendants
for OUs 3.01, 3.02, 3.03 and 3.04 each show an appraisal date of
November 2, 2013.

49.    These Appraisal Worksheets also contain the "Adjuster's
Signature" of Thybo (dated November 5, 2013) and the "Insured's
Signature" of "T.H. By JT," (dated November 5, 2013).

50.    Plaintiff Hostler never authorized Thybo to initial any
documents on his behalf.

51.    Thybo testified he needed to put some marking in the
"Insured's Signature" blank in order for the documents to print and/or
be submitted.  As such, he chose to include Plaintiff Hostler's initials as
the marking in the blank.

52.    Despite Thybo's November 5, 2013 signature on the appraisal
worksheet, Plaintiff Hostler was not provided with a copy of his Claim
Summary until mid-February 2014.

8

53. By late November 2013, Plaintiff Hostler had still not heard anything from Defendants regarding a loss appraisal for his Butte County OUs.

54. As such, on or about November 23, 2013, Plaintiff Hostler contacted Defendants to inquire about the status of his claim in Butte County. At that time, Plaintiff Hostler testified that Defendants' claims manager Jeff Younie ("Younie") informed him that no insurance appraisal had yet been submitted to Defendants.

55. As a result of this conversation, Plaintiff Hostler told Defendants he would plan to harvest the remaining strips on his Butte County land in a few days, and would like the adjusters to be present so they could verify his harvested production.

56. At that time, Defendants assured Plaintiff Hostler that adjusters would be present to verify his harvest and that his harvested production data would be used to appraise his loss.

57. On November 23, 2013 Thybo visited Plaintiff Hostler's property and took approximately thirteen (13) pictures of Plaintiff Hostler's Butte County OUs.

58. At arbitration, Dean Weinzetl ("Weinzetl") submitted an affidavit stating he met the adjusters in Plaintiff Hostler's fields on November 23, 2013.

9

59.     Weinzetl further stated that the adjusters offered him a beer on November 23, 2013.

60.     Thybo testified he took these pictures on November 23, 2013 because, at that time, he had been told there was likely to be a problem with Plaintiff Hostler's claim.

61.     However, Plaintiff Hostler had not been made aware of any appraisal by November 23, 2013, and Plaintiff Hostler had not harvested his RSAs by that date. As such, Plaintiff Hostler would not have known of any potential issue with his claim on November 23, 2013. Any potential "problem" with Plaintiff Hostler's claim on November 23, 2013 would have to have been solely identified by Defendants.

62.     On or about November 26, 2013, Plaintiff Hostler harvested the RSAs in his Butte County fields.

63.     At arbitration, Bialas testified that the data procured from harvesting RSAs is the most accurate way to determine potential production of a field. In his experience, if an insured harvests his RSAs, those numbers are used for the appraisal. Defendants' insurance adjusters were present at Plaintiff Hostler's fields on November 26, 2013.

64.     Thybo took his "November 23, 2013" pictures before Plaintiff Hostler's RSA harvest date.

10

65.     Plaintiff Hostler's weigh slips for the corn harvested from his Butte County OUs were electronically dated November 26, 2013.

66.     Thybo did not review any appraisal with Plaintiff Hostler on the date Plaintiff Hostler harvested his RSAs.

67.     Daren Durr ("Durr") helped Plaintiff Hostler harvest his RSAs on November 26, 2013.

68.     Durr testified there was no corn to be harvested in OU 3.01.

69.     Durr further testified that he informed Thybo that he was not able to harvest any measurable amounts of corn from OU 3.02.

70.     Upon meeting the adjusters on November 26, 2013, Plaintiff Hostler believed the adjusters' vehicle smelled strongly of alcohol and so he asked Durr to request a beer from the adjusters.

71.     The adjusters offered Durr and Plaintiff Hostler a beer on November 26, 2013.

72.     Bialas testified it was not typical, and likely against company policy, for insurance adjusters to carry alcohol with them when performing official business.

73.     Kluge testified it was not company policy for adjusters to carry alcohol with them during appraisals or visits to fields.

74.     Plaintiff Hostler testified that the adjusters asked him to ride with them to examine his fields on November 26, 2013.

11

75.    While in the vehicle, there was a heated discussion regarding measurement of Plaintiff Hostler's RSAs.

76.    The measurement of Plaintiff Hostler's RSAs was important because they would be compared to his harvested production to determine his appraised bushels per acre. As such, Plaintiff Hostler's appraised bushels per acre would fluctuate greatly based on the exact measurement of how many acres had been left in each RSA.

77.    At arbitration, Plaintiff Hostler testified that, during this argument, Kymala told him, "East River farmers have gone broke out here, and it could happen again."

78.    Plaintiff Hostler heard nothing further from Defendants until mid-December.

79.    In mid-December 2013, two employees of Defendants, Younie and Justin Morrison ("Morrison"), approached Plaintiff Hostler on his farm in an attempt to have him sign his claim summary. Noting that the documents were largely incomplete, Plaintiff Hostler refused to sign.

80.    Plaintiff Hostler heard nothing further from Defendants about his insurance claim in Butte County until his attorney acquired a copy of a draft claim summary in February 2014.

81. From December 2013 through late February 2014, Plaintiff Hostler demanded payment on his insurance claims for the other counties he farmed in South Dakota.

82. Defendants informed him that these payments could not be made until both parties had reached an agreement on his Butte County claim.

83. Plaintiff Hostler finally received payment for his non-Butte county claims in late February 2014.

84. At arbitration, Bialas testified there was no reason why Defendants could not have paid Plaintiff Hostler's other pending insurance claims, even though a dispute with his Butte County acres existed. Bialas explained each of these "OUs" were separate contracts and should have been handled separately.

85. At arbitration, Kluge also testified that Plaintiff Hostler's non-Butte County insurance claims should have been paid in a timely manner.

86. After receiving his Claim Summary in February 2014, Plaintiff Hostler learned an appraisal had allegedly been performed on November 2, 2013. Plaintiff Hostler further learned that these appraisal numbers, rather than the harvested production data, had been used in his final claim appraisal.

13

87.     There are large differences in Defendants' appraisal of Plaintiff Hostler's fields and the harvested production data Plaintiff Hostler collected concerning his fields.

88.     At arbitration, Thybo and Kymala's only explanation for the difference in yields between their appraisal and Plaintiff Hostler's harvest data was that a number of deer ate the missing corn production.

89.     At arbitration, Plaintiff Hostler testified one bushel of corn weighs approximately fifty-six (56) pounds.

90.     Plaintiff Hostler left approximately six (6) acres of RSAs across all of OU 3.01, 3.02, 3.03 and 3.04.

91.     Thirty-five (35) bushels per acre times six (6) acres equals 210 total bushels. 210 bushels times 56 pounds equals (at a minimum) 11,760 pounds of corn that deer would have had to eat from November 2, 2013 through November 26, 2013, when Hostler harvested his RSAs.

92.     Bialas did not believe it was reasonable for a number of deer to eat or destroy (over the course of approximately 20 days) the difference in yields between Defendants' appraisal and Plaintiff Hostler's harvested production.

93.     Defendants' Claim Summary appraised OU 3.01's RSAs as having produced 67.8 bushels per acre.

14

94.    Plaintiff Hostler had no harvest production data from OU 3.01 because Plaintiff Hostler had not left any RSAs to be harvested or appraised in OU 3.01.

95.    Defendants' Claim Summary appraised OU 3.02's RSAs as having produced 39.9 bushels per acre.

96.    Plaintiff Hostler's harvest of OU 3.02 resulted in zero (0) bushels per acre.

97.    Defendants' Claim Summary appraised OU 3.03's RSAs as having produced 73.3 bushels per acre.

98.    Plaintiff Hostler's harvest of OU 3.03 resulted in 38.9 bushels per acre.

99.    Defendants' Claim Summary appraised OU 3.04's RSAs as having produced 106.4 bushels per acre.

100.    Plaintiff Hostler's harvest of OU 3.04 resulted in 49.7 bushels per acre.

101.    After failing to reach an agreement on Plaintiff Hostler's insurance claim, the parties proceeded to arbitration on June 29-30, 2015.

102.    Jack G. Marcil ("Marcil") served as arbitrator.

103.    On August 13, 2015, Marcil issued his "Findings of Fact, Conclusions of Law and Award."

104. Marcil's "Conclusion of Law" stated as follows::

   a. Defendants did not follow the procedures of the Federal
      Crop Insurance Loss Adjustment Manual, the Corn Loss
      Adjustment Manual, or the Document and Supplemental
      Standards Handbook.

   b. Defendants have a responsibility to follow the appraisal
      procedures listed in the Adjustment Manuals so that when
      questions arise regarding appraisals, they can be sure they
      provided each insured a fair assessment of their losses.

   c. When Defendants chose not to follow the procedures
      outlined in the Adjustment Manuals they created
      questions regarding the value and veracity of the appraisal
      performed.

   d. Defendants failed to appraise Hostler's Butte County fields
      in a timely manner.

   e. Hostler filed his claim on September 3, 2013. Thybo
      reports he didn't receive notice of the claim until
      September 19, 2013. Thybo did not attempt to appraise
      Hostler's fields for another 45 days.

16

f. Once Defendants did perform an appraisal, it is clear the adjusters chose to do things "their way" over the "right way."

g. Thybo's testimony revealed his lack of knowledge regarding the proper adjustment procedures and his lack of preparedness for having the proper equipment to perform the proper appraisal.

h. Further, the adjusters admit an improper appraisal of at least Hostler's OU 3.01, admitting they took unrepresentative samples from these acres and entering them into the appraisal worksheet. These admissions raise serious questions regarding the reliability of the remainder of [Defendants'] appraisal.

i. Moreover, [Defendants] continually failed, despite LAM procedures, to involve [Plaintiff Hostler] in any way in this appraisal process.

j. All parties who testified [at arbitration] agreed that 90 percent of the time, an insured is involved in his appraisal process, and that 100 percent of the time, an insured is at least given the opportunity to review his finalized appraisal.

k. [Defendants] failed to allow Hostler's participation in this appraisal, and failed to allow Hostler to review his appraisal, despite repeated opportunities to do so.

l. If an appraisal is not performed in accordance with proper guidelines, Hostler is left without any real confidence that his claims were properly evaluated.

m. Further, it is not credible to assume that the extreme difference between [Defendants'] appraisal and Hostler's harvested production data can be attributed simply to a number of wild deer seen in the area.

n. [Defendants'] adjusters admitted going above and beyond normal practices in monitoring Hostler's ground and preparing records which would later be submitted as part of their "Special Report" to justify an appraisal for which they knew there would "be a problem."

o. [Defendants] admit that [Jason] Mathis (Defendants' Claims Manager) should not have been working on this claim, and his involvement from the start provides another reason to doubt the fairness of the appraisal.

p. Considering all of these facts, [Defendants'] appraisal must be discarded. [Defendant] has left too many questions

18

concerning the accuracy of their appraisal. Further, it
would be impractical to attempt to pick and choose certain
parts of [Defendants'] appraisal as more accurate than
others.

105. Before arbitration commenced, Defendants paid Plaintiff
Hostler $25,275.00 on his crop insurance claim.

106. At arbitration, Plaintiff Hostler was awarded a total crop
insurance indemnity payment of $70,174.35, plus interest, due to
Defendants' mishandling of Plaintiff Hostler's claim.

107. In addition to the crop adjustment issues, Plaintiff Hostler
also had a number of his insured acres disqualified by Defendants.

108. Plaintiff Hostler first learned of these disqualified acres in
February 2014.

109. At that time, Plaintiff Hostler discovered that 74.1 of his Butte
County acres had been classified as "uninsurable" due to being "non-
irrigable."

110. Defendants had not provided Plaintiff Hostler with any notice
that there might be a problem regarding whether his acres could be
classified as "irrigable" before February, when Plaintiff Hostler received
his claim summary.

19

111. Both Thybo and Kluge testified at arbitration that they did not request any documentation from Plaintiff Hostler in order to determine whether his acres were irrigable under the insurance policy provisions.

112. At arbitration, Bill Anderson ("Anderson"), manager of Plaintiff Hostler's irrigation district, testified that the Irrigation District had no working relationship with any insurance companies, and in his time working with the irrigation district, he had never observed an insurance company make an inquiry to his office regarding irrigable/nonirrigable acres.

113. At arbitration, Thybo testified this was the first time he ever went to an Irrigation District to inquire whether certain acres were "irrigable" for crop insurance purposes.

114. At arbitration, Kymala testified that in his experience working in Butte County, he had never investigated whether acres were "irrigable" for crop insurance purposes.

115. In 2013, Jason Mathis ("Mathis") was the claims supervisor for the entire state of South Dakota.

116. Plaintiff Hostler has a previous working relationship with Mathis and Mathis's brother, Jim Mathis.

117. Plaintiff Hostler and Mathis do not have a good relationship due to previous land transactions.

20

118. As early as June 2013, Mathis had instructed Thybo to "keep an eye on" Plaintiff Hostler's newly purchased land in Butte County, despite the land not yet being insured by Defendants.

119. As a result, Thybo submitted a note in his "Special Report" for Plaintiff's Hostler's claim which recounted his visit to Plaintiff Hostler's property on June 7, 2013.

120. Thybo also submitted six (6) photographs in his special report which were taken on August 30, 2013. These photographs were taken four (4) days before Plaintiff Hostler submitted his claim to Defendants and more than twenty (20) days before Thybo purported to receive notice of Plaintiff Hostler's claim.

121. Thybo took these photographs pursuant to Mathis' instructions to keep an eye on Plaintiff Hostler's land.

122. Thybo further testified he does not typically take photographs of a farmer's land throughout Butte County.

123. Upon information and belief, Mathis is no longer employed by Defendants.

124. Kluge removed Mathis from the claim as soon as he found out Mathis was working on it.

21

125. Upon information and belief, Thybo and Kymala are employed by Defendants and serve as representatives of Defendants when interacting with its insurance customers.

126. Defendants had a duty to perform a reasonable investigation of Plaintiff Hostler's claim.

127. Using and relying upon the opinions and reports of adjusters, such as Thybo and Kymala, who did not even possess equipment necessary to perform the proper appraisal method provided by the Corn Loss Adjustment Manual, is not a reasonable investigation.

128. A part of each premium Defendants charge includes a portion for the expenses required to investigate claims.

129. A reasonable investigation requires the insurer to look for reasons to pay, and not just reasons not to pay.

130. A reasonable investigation requires the insurer to assign adjusters who would not have conflicts or previous relationships or dealings with an insured which might interfere with the adjuster's ability to render an accurate opinion.

131. In evaluating Plaintiff Hostler's claims, Defendants had a duty to give just as much consideration to Plaintiff Hostler's interests as it gave to its own interests.

132. Even if the adjusters used by Defendants are not employees of Defendants, Defendants cannot eliminate its duties owed to Plaintiff Hostler, including duties of good faith and fair dealing, by delegating them to third parties or independent contractors.

133. Defendants are responsible for the investigation and evaluation of Plaintiff Hostler's claim by its adjusters.

## COUNT ONE
## (UNFAIR TRADE PRACTICES)

134. Plaintiff Hostler realleges the above paragraphs.

135. Based upon the above facts, Defendants' conduct amounts to unfair and/or deceptive acts or practices in the business of insurance as proscribed in general by S.D.C.L. § 58-33-67.

136. Defendants' conduct constitutes a specific act proscribed by S.D.C.L. § 58-33-67(1), namely the failure to adopt and adhere to reasonable standards for the prompt investigation of claims.

137. Defendants' conduct constitutes a specific act proscribed by S.D.C.L. § 58-33-67 (3), namely failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for an issue of coverage.

138. Plaintiff Hostler has suffered actual and consequential damages as a result of Defendants' actions.

139. Therefore, Plaintiff Hostler is entitled to recover all of his

actual and consequential damages as a result of Defendants' unlawful acts or practices, as provided by S.D.C.L. § 58-33-46.1.

140. Included in that calculation of damages are Plaintiff Hostler's reasonable attorneys' fees to be established by the Court, as provided by S.D.C.L. § 58-33-46.1.

## COUNT TWO
## (BREACH OF CONTRACT)

141. Plaintiff Hostler realleges the above paragraphs.

142. Based upon the above facts, the parties entered into a valid contract of insurance as set forth herein.

143. Defendants failed to perform in the manner required by the contract of insurance and have breached the contract.

144. Plaintiff Hostler has fully performed all of the terms and conditions required of Plaintiff Hostler by the terms of the contract, except those waived, excused, or prevented by Defendants, and Defendant's performance has not been excused.

145. As a direct and legal result of Defendants' breach of the contract, Plaintiff Hostler has suffered damages in an amount to be proven at trial.

## COUNT THREE
## (BREACH OF IMPLIED WARRANTIES
## OF GOOD FAITH AND FAIR DEALING)

146. Plaintiff Hostler realleges the above paragraphs.

147. Based upon the above facts, a warranty of good faith and fair dealing exists as an implied warranty in a contract of insurance, pursuant to which Defendants agreed to deal in good faith and fairly with Plaintiff Hostler and to avoid any act that would deprive Plaintiff Hostler of the benefits of the contract.

148. Defendants breached these warranties as set forth herein.

149. Plaintiff Hostler has fully performed all of the terms and conditions required of Plaintiff Hostler by the terms of the contract, except those waived, excused, or prevented by Defendants, and Defendant's performance has not been excused.

150. By its breach of these implied warranties, Defendants breached the agreement.

151. As a direct and legal result of Defendants' breach of the implied covenants and warranties of good faith and fair dealing, Plaintiff Hostler has suffered damages in an amount to be proven at trial.

## COUNT FOUR
## (NEGLIGENT SUPERVISION)

152. Plaintiff Hostler realleges the above paragraphs.

153. Defendants had a duty to supervise the performance of its

employees and adjusters and to ensure that its employees and adjusters

acted in a manner consistent with Defendants' duties to its insured.

154. Defendants breached this duty.

155. As a direct and legal result of Defendants' breach of this duty,

Plaintiff Hostler has suffered damages in an amount to be proven at trial.

## COUNT FIVE
## (FIRST PARTY BAD FAITH)

156. Plaintiff Hostler realleges the above paragraphs.

157. Defendants have a duty to perform a reasonable investigation

of Plaintiff Hostler's claims and to ensure that its adjusters had no

conflicts.

158. Defendants breached this duty.

159. Defendants had knowledge or recklessly disregarded the lack

of a reasonable basis for its investigation and acted with reckless

indifference to the facts and/or ignored evidence that supported coverage

for Plaintiff Hostler.

160. Defendants ignored evidence which supported Plaintiff

Hostler's claims.

26

161. Defendants also had a duty to pay Plaintiff Hostler's claim in a manner consistent with the terms of the insurance policy.

162. Defendants failed to pay Plaintiff Hostler's claim in a manner consistent with the terms of the insurance policy without a reasonable basis to do so.

163. Defendants had knowledge or recklessly disregarded the lack of a reasonable basis for the manner in which it handled Plaintiff Hostler's payment and acted with reckless indifference to the facts and/or ignored evidence that supported payment for Plaintiff Hostler.

164. Defendants ignored evidence which supported Plaintiff Hostler's claims.

165. As a direct and legal result of Defendants' actions, Plaintiff Hostler has suffered damages in an amount to be proven at trial.

## COUNT SIX
## (FRAUD/DECEIT)

166. Plaintiff Hostler realleges the above paragraphs.

167. Defendants owe Plaintiff Hostler the legal duty to respect Plaintiff Hostler's rights of property and refrain from invading them by fraud.

168. Defendants breached this duty by making untrue statements and material omissions regarding its investigation and payment of Plaintiff Hostler's claim.

27

169. In the alternative, Defendants' statements constituted statutory deceit under S.D.C.L. § 20-10-1 and S.D.C.L. § 20-10-2(1)-(3).

170. Defendants' untrue statements and omissions were material, Plaintiff Hostler relied on them, and conducted his affairs believing Defendants' statements to be true.

171. Defendants acted recklessly or intentionally in making these misstatements, and knew that Plaintiff Hostler would rely upon them.

172. Plaintiff Hostler was damaged as a result of Defendants' conduct.

## COUNT SEVEN
## (PUNITIVE DAMAGES)

173. Plaintiff Hostler realleges the above paragraphs.

174. Defendants are guilty of oppression, fraud, actual malice, and/or presumed malice.

175. Defendants acted intentionally, or with willful and wanton misconduct, and in disregard for the rights of others, and punitive damages are necessary and appropriate in order to punish and deter.

## COUNT EIGHT
## (ATTORNEY FEES UNDER S.D.C.L. § 58-12-3)

176. Plaintiff Hostler realleges the above paragraphs.

177. Based upon the above facts, Plaintiff Hostler is entitled to a

28

reasonable sum for his attorneys' fees to be recovered and collected as part of the costs, pursuant to S.D.C.L. § 58-12-3.

WHEREFORE, Plaintiff Hostler seeks damages in the amount determined by the jury at trial, along with his attorneys' fees, costs, prejudgment interest, and other relief deemed appropriate by this Court.

Dated this 30th day of June, 2016.

SWIER LAW FIRM, PROF. LLC

Scott R. Swier
Michael A. Henderson
202 N. Main Street
Avon, South Dakota 57315
Telephone:  (605) 286-3218
Facsimile:  (605) 286-3219
scott@swierlaw.com
mike@swierlaw.com

*Attorneys for Plaintiff Travis Hostler*

29

**TRIAL BY JURY IS DEMANDED BY PLAINTIFF HOSTLER**

Dated this 30th day of June, 2016.

SWIER LAW FIRM, PROF. LLC

Scott R. Swier
Michael A. Henderson
202 N. Main Street
Avon, South Dakota 57315
Telephone:   (605) 286-3218
Facsimile:   (605) 286-3219
scott@swierlaw.com
mike@swierlaw.com

*Attorneys for Plaintiff Travis Hostler*

30